IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

**ANTHONY BROWN,**

           Plaintiff,

    vs.

**LANE COUNTY; DR. ALFREDO VELEZ;
NATHAN L. GENT; WELLPATH, LLC;
JOHN/JANE DOES 1-5,**

          Defendants.

Case No. 6:21-cv-01866-AA
**OPINION AND ORDER**

AIKEN, District Judge:

    Plaintiff Anthony Brown proceeds *in forma pauperis* ("IFP") in this civil rights action against defendant Dr. Alfredo Velez. Before the Court is defendant's motion for summary Judgment ("Mot."), ECF No. 40, and plaintiff's motion to amend or correct his answers to defendant's requests for admissions ("RFA Mot."), ECF No. 42. For the reasons explained below, defendant's motion for summary judgment, ECF No. 40, is GRANTED. Plaintiff's RFA motion, ECF No. 42, is DENIED.

## BACKGROUND

    Plaintiff was incarcerated at Lane County Adult Correctional Facility for an Assault 4, strangulation charge in October 2019. SAC ¶ 9. There, he received mental

health treatment from providers including defendant Dr. Velez, a Wellpath employee. Plaintiff's medical records describe a history of anxiety, depression, attention deficit hyperactivity, and panic disorders, including an occasion where a "panic attack . . . turned into a seizure." Taylor Decl. Ex. 1 at 0044-45; 48-49.[1] Plaintiff stopped taking his prescribed mental health medications and told his health providers that he had been smoking meth daily. *Id*. In December 2019, plaintiff expressed interest in returning to medical management of his mental health. *Id*. at 0024.

## I.    Plaintiff Begins Treatment

On December 24, 2019, defendant met with plaintiff. *Id*. at 0023. The record shows a notation that plaintiff was "guarded in his presentation" and "afraid to divulge many details of his recent [history]" due to "shame and guilt over his meth use." *Id*. at 0022. Plaintiff told defendant that he had previously been diagnosed with PTSD and bipolar disorder and was currently experiencing "daily anxiety and insomnia" along with hearing "voices at night." *Id*. He could not recall which prior meds he had or had not taken or found effective. *Id*. Defendant prescribed Depakote[2] and Desyrel/Trazodone.[3] Taylor Decl., Ex. 1 at 0022.

---

[1]    Medical records are included as exhibits in the Declaration of Ross Taylor. The Court will cite to the pagination marked in the bottom right-hand corner, after the abbreviation "ABRO."

[2]    Depakote (divalproex sodium) has been approved by the U.S. Food and Drug Administration for use to treat bipolar disorder. https://www.accessdata.fda.gov/drugsatfda_docs/labe1/2011/018723s0371b1.pdf

[3]    Desyrel (trazodone) is a selective serotonin reuptake inhibitor (SSRI) approved for treatment of depressive disorder. https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/018207s032lbl.pdf

Defendant discussed with plaintiff the "risks and benefits, effects and [side effects]" of the medications. *Id*. at 0023. Plaintiff memorialized his agreement that: he had been informed that there was no guarantee of benefit; that the side effects had been discussed with him; and that he could choose to withdraw consent at any time. *Id*. at 0051.

Evidence in the record is that plaintiff received the first dose of both the medications he was prescribed that very same night of December 24, 2019. *Id*. at 0002. The medications were provided as ordered over the following days. On December 29, 2019, plaintiff asked to "see someone" about his "treatment program" and release plan, expressing concern that the Trazadone was "not working very well" and that he was experiencing side effects. *Id*. at 0057.

In response to plaintiff's request, defendant held an appointment with him on December 31, 2019. *Id*. at 0032. Although at the first visit, plaintiff could not recall his prior medications, he now related that he used to take Seroquel to good effect. *Id*. Plaintiff also requested to try an SSRI for his anxiety. *Id*. Based on plaintiff's requests and representations, defendant discontinued the Trazadone and started him on Doxepin[4] and Escitalopram.[5] Defendant also increased plaintiff's Depakote dose because plaintiff described it as not "having enough effect." Taylor Decl., Ex 1 at 0032.

## II.    Plaintiff's Episode with Guards, Physicians

---

[4] Doxepin is indicated for treatment of depression and/or anxiety.
https://www.accessdata.fda.gov/drugsatfda_docs/label/2014/070791s027lbl.pdf
[5] Escitalopram (Lexapro) is a selective serotonin reuptake inhibitor (SSRI) indicated for treatment of depression and/or anxiety.
https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/021323s047lbl.pdf

On January 3, 2020, jail medical staff responded to a call about plaintiff demonstrating odd behaviors. *Id*. at 0018-19. Plaintiff was found lying on his mattress and generally would not verbally respond to any staff. *Id*. Although none of his vital signs were abnormal, his providers and jail personnel determined he should be taken to the medical unit for further evaluation. *Id*.

On his way to the medical evaluation, plaintiff stood and walked, at times resisting deputies. *Id*. At the medical unit, plaintiff told deputies that he was not suicidal, but would not respond to any other questions. *Id*. A plan was developed to regularly check on plaintiff, with a factor in this decision being that plaintiff had been recently caught hiding and not taking his Depakote. *Id*. at 0018-19.

### III.    Plaintiff's Medication Refusals vs. Requests to Increase Medication

The next day, a mental health provider checked on plaintiff in the medical unit. *Id*. at 0031. Plaintiff stated that he was not sure why he had "passed out" the day prior but guessed that it was "potentially an allergic reaction." *Id*. Plaintiff reported that since January 3, 2020, he had refused his doses of Doxepin and Escitalopram "because he did not like" how they made him feel. *Id*.

Although he expressed the Depakote was "helping" with his depression, he had been refusing that medication as well. *Id*. (reporting a benefit from the Escitalopram); *Id*. at 0002 (showing plaintiff's refusals). Plaintiff accepted one more dose of Depakote on January 6, 2020, but after later refusals, the jail the Depakote. *Id*. at 0002, 11. On January 8, 2020, plaintiff submitted two non-emergent health service requests, one asking for an increase in his medications and the other claiming that he had been

given too much Depakote. *Id*. at 0059-60. However, the medical record shows that plaintiff had been *refusing* Depakote, and that the jail was no longer offering it to plaintiff. *Id*. at 0002, 11.

Days later, on January 12, plaintiff again requested an increase of his medications, which would be one of many such requests he would make over the remainder of his incarceration. *Id*. at 0061 (January 12, 2020, request); *see also, e.g.*, *Id*. at 0071, 73-74. Plaintiff repeated his claim that the jail had provided him too much Depakote on January 13, 2020, even though that medication was no longer being offered. *Id*. at 0029.

## IV.    Subsequent Care and Diagnosis

On January 15, 2020, plaintiff was seen by psychologist, Cherul Gifford. *Id*. at 28-39. After evaluating plaintiff, she recorded an assessment of "epileptic episodes v. malingering." *Id*. at 0028-29. Plaintiff was next evaluated by a medical Nurse Practitioner who found plaintiff to be a "very poor historian" and, after evaluation, found plaintiff to be in good health outside of a headache. *Id*. On January 21, 2020, defendant Dr. Velez followed up in response to plaintiff's claimed "episodes." *Id*. at 0040-41. Plaintiff was alert and oriented and his cognition appeared intact. *Id*. Through consultation, plaintiff agreed to try a new medication as a substitute for the Depakote. *Id*. Plaintiff remained incarcerated into May of 2020, receiving ongoing medical and mental health treatment, including encounters with defendant Dr. Velez. Because these events appear unrelated to the allegations of plaintiff's SAC, the Court will not summarize that evidence.

### V.    Lawsuit

Plaintiff filed his Complaint on December 23, 2021, along with an application to proceed IFP. *See* ECF Nos. 1 and 2. The Court dismissed the Complaint on January 21, 2022, with leave to amend, on grounds that plaintiff failed to state a claim upon which relief could be granted, and thus failed to meet the standard for plaintiff to proceed IFP. Order, ECF No. 7. Plaintiff filed an amended complaint. SAC, ECF No. 27. Defendant moved to dismiss plaintiff's claims under Rule 12(b)(6). The Court granted in part defendant's motion to dismiss. ECF No. 35.

As relevant here, plaintiff's surviving claims against defendant Dr. Velez include (1) medical negligence and (2) negligent infliction of emotional distress, both under Oregon state law. Plaintiff alleges that defendant prescribed plaintiff "seizure and psychotropic drugs for no apparent reason" resulting in plaintiff suffering from "Serotonin Syndrome." SAC ¶ 9. Plaintiff alleges that the medications were "intended for a different patient." *Id*.

Plaintiff states that, in the days that followed treatment, he remained in a state of "semi-blackout" during which he fell and hit his head three times. *Id*. at ¶ 11-12. Plaintiff maintains that, because he was "medically addled" and physically non-compliant, a correctional guard mistook plaintiff's "medically-induced rigidity" with defiance and "dealt violently" with plaintiff by "slamm[ing] him to the ground" and dislocating his right shoulder. *Id*. at ¶ 13. In plaintiff's view, "as a proximate result" of defendant's negligent "medical prescription poisoning," he suffered physical injury and emotional anguish. *Id*. at ¶ 16.

On April 14, 2023, Dr. Velez served Requests for Admission ("RFAs") on plaintiff. Taylor Decl. Ex. 2. Under Rule 36, plaintiff's replies were due May 14, 2023. Plaintiff did not respond by that date. Before filing his motion for summary judgment, defendant conferred with plaintiff in accordance with Local Rule 7, notifying plaintiff of each issue in the proposed motion.  When plaintiff learned that defendant was moving on the grounds that plaintiff failed to respond to defendants RFAs, plaintiff sent, that night after 8:00 PM, the requested responses. MSJ at 7.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324. Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact

should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630-31.

## DISCUSSION

Defendant moves for summary judgment on plaintiff's claims, contending that plaintiff failed to timely answer requests for admission, establishing as a matter of law plaintiff's admission that there was no negligence, causation, or harm. *Id*. Additionally, defendant asserts that, even without the deemed admissions, the record establishes that there is no genuine dispute as to any material fact and defendant is entitled to judgment as a matter of law.

In response, plaintiff provides a declaration from Dr. Mark Baskerville. *See* Baskerville Decl., ECF No. 44. Dr. Baskerville stated that he reviewed "a medication log" and "[plaintiff's] email correspondence with his lawyer and concluded that Dr. Velez violated the standard of care and negligently inflicted emotional distress on plaintiff. Baskerville Decl. ¶ 7. Plaintiff's opposition to summary judgment is based exclusively on Dr. Baskerville's declaration. Resp. at 9, ECF No. 43.

## I.    Whether Plaintiff's Failure to Respond is a "Deemed Admission"

As an initial matter, the Court agrees with defendant that, in reaching its decision on summary judgment, evidence in the record is sufficient, such that the Court need not rely on plaintiff's legally "deemed" admissions. Accordingly, plaintiff's motion to amend or correct his RFAs is DENIED. The Court did not consider plaintiff's admissions—or lack thereof—in resolving defendant's motion.

## II.    Admissibility of Expert Opinion

For medical malpractice claims, expert testimony is generally required to establish the standard of care. *See Getchell v. Mansfield*, 260 Ore. 174, 179, 489 P2d 953 (1971) ("In most charges of negligence against professional persons, expert testimony is required to establish what the reasonable practice is in the community."). The rationale behind that rule is that a layperson typically would not know what an "ordinarily careful" physician would do under the circumstances. *See id.* (Noting that the reason for the expert testimony requirement is that "what is reasonable conduct for a professional is ordinarily not within the knowledge of the usual jury").

Regarding the sufficiency of information, an expert's opinion must rest on "facts or data in the case that the expert has been made aware of or personally observed," not merely assumptions and speculation. Fed. R. Evid. 703; *see Gui-droz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 830-31 (9th Cir. 2001); *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998). A party's own speculation is insufficient to create a genuine issue of material fact and a party cannot make it sufficient simply by finding an expert who is willing to assume its correctness. *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856-57 (9th Cir. 2019).

Further, an expert's opinions are not reliable where the expert bases her conclusions on "mere subjective beliefs or unsupported speculation." *Claar v. Burlington N.R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994). "An opinion based on . . . unsubstantiated and undocumented information is the antithesis of the scientifically

reliable expert opinion admissible under Daubert and Rule 702." *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998). In determining the reliability of proffered expert testimony, the district court's task "is to analyze not what the experts say, but what basis they have for saying it." *Daubert v. Merrell Dow Pharm., Inc. ("Daubert II")*, 43 F.3d 1311, 1316 (9th Cir. 1995). "

Here, Dr. Baskerville states that he has reviewed only "a medication log provided by the client (see Attachment B) and [Plaintiff]'s email correspondence with his attorney." Baskerville Decl., ¶ 4. The emails are not attached as exhibits, so it is unknown what they provide. Dr. Baskerville's declaration merely recites that plaintiff "may have received another inmate's medication." *Id* ¶ 3. Next, The medication log, however, is only a small excerpt of plaintiff's medical record. It contains only the medication prescribed, starting and ending dates of the order, the ordering clinician, its status (e.g. "approved" or "pending"), and whether it is to be provided on a schedule or as needed ("PRN"). Baskerville Decl., Ex. 2.

Dr. Baskerville did not review any other portion of the medical record. There is no evidence that his testimony was developed from a review or understanding of plaintiff's clinical evaluations in the jail; Dr. Velez's December 24, 2019, encounter with plaintiff from which medications were ordered; plaintiff's consent to the medications; plaintiff's following evaluations and encounters with medical and mental health staff; Dr. Velez's December 31, 2019, encounter with Plaintiff at which the prescriptions were adjusted; or any of the documented events which followed.

Accordingly, Dr. Baskerville lacks sufficient information to form any opinions about the propriety of the prescriptions written, the rationale for them being ordered, or the effect they may or may not have had on plaintiff. The portions of the declaration that constitute Dr. Baskerville's opinion, therefore, are stricken.

## III.    Medical Negligence

Plaintiff claims defendant negligently prescribed plaintiff's medications, and caused him prescription poisoning resulting in battery by prison guards to gain plaintiff's compliance while in a medically "addled" state. SAC ¶¶ 13, 30, 35. Defendant argues that plaintiff's exclusive reliance on Dr. Baskerville's declaration to establish a triable issue of fact fails. Defendant contends that (1) Dr. Baskerville is not qualified to opine on the standard of care of Dr. Velez; (2) Dr. Baskerville's declaration does not actually establish that Dr. Velez violated any standard of care; and (3) Dr. Baskerville's declaration does not establish causation. MSJ at 3.

To prevail on a medical negligence claim in Oregon, a plaintiff must establish "(1) a duty that runs from the defendant to the plaintiff; (2) a breach of that duty; (3) a resulting harm to the plaintiff measurable in damages; and (4) causation, i.e., a causal link between the breach of duty and the harm." *Swanson v. Coos Cnty.*, 2009 WL 5149265, Civ. No. 08–6312–AA, at *5 (D.Or.2009) (citing *Stevens v. Bispham*, 316 Or. 221 (1993). In Oregon, the common-law standard has been codified to read as follows: A physician licensed to practice medicine or podiatry by the Oregon Medical Board has the duty to use that degree of care, skill and diligence that is used by

ordinarily careful physicians in the same or similar circumstances in the community of the physician or a similar community. ORS 677.095(1).

Plaintiff must also establish causation. In an Oregon medical malpractice case, the plaintiff must present evidence that there is a "reasonable medical probability" that a defendant's negligence caused harm to plaintiff. *See Joshi v. Providence Health System of Oregon*, 198 Or. App. 535, 544, 108 P.3d 1195 (2005), *aff'd by* 342 Or. 152, 149 P.3d 1164 (2006); *Horn v. National Hospital Association*, 169 Or. 654, 679, 131 P.2d 455 (1942). Causative proof "must have the quality of reasonable probability, and a mere possibility that the alleged negligence of the defendant was the cause of plaintiff's injuries is not sufficient." *Cleland v. Wilcox*, 273 Ore. 883, 887, 543 P.2d 1032 (1975); Sims v. Dixon, 224 Ore. 45, 48, 355 P.2d 478 (1960); *see also Henderson v. U. P. R. R. Co.*, 189 Or. 145, 162, 219 P.2d 170 (1950) ("Without competent medical testimony that the blow which the plaintiff received was the probable cause of the gangrene and resulting amputation, there could be no case sufficient to go to the jury on that question.").

Here, the evidence shows that there was no deviation from the standard of care. Dr. Velez saw plaintiff on December 24, 2019, and December 31, 2019. At the first visit, Dr. Velez assessed plaintiff—a patient with a significant mental health history, who had been off his medications for months while using illicit drugs, and prescribed medications aimed at providing plaintiff relief. When plaintiff complained of unwanted side effects, Dr. Velez evaluated him again and adjusted the pharmacological approach, discontinuing one, adjusting the dose of another, and

writing prescriptions for additional medications. Plaintiff has produced no evidence to substantiate his claims that these medications were "mis-prescribed" or intended for some other patient. The medical record shows the contrary, and evidence of plaintiff malingering.

As for causation, plaintiff produces no evidence that a purported standard of care violation caused plaintiff some harm on a reasonable medical basis. This is especially true for plaintiff's claim that defendant caused a "multi-day-blackout" and battery by jail staff.

Plaintiff has offered highly attenuated conclusory accusations. even in viewed in the light most favorable to plaintiff, and in the abstract and not for medical opinion, the declaration of Dr. Baskerville is, at most, unhelpful. Accordingly, summary judgment is granted to defendant.

## IV.    Negligent Infliction of Emotional Distress

Plaintiff alleges that the Dr. Velez, committed medical negligence in its prescription poisoning of [P]laintiff and the ensuing emotional, psychological and physical injuries to his mind, body and soul, head, arms, shoulder neck, constituted Negligent Infliction of Emotional Distress." SAC ¶ 35. Further, that "Dr. Velez negligently inflicted severe emotional distress on [Plaintiff], his acts were the cause of [Plaintiff's] severe emotional distress, and [Dr. Velez's] acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *Id.*

Oregon law allows a plaintiff to recover damages for emotional distress when a defendant negligently causes foreseeable, serious emotional distress that infringes

on some other legally protected interest. *Philibert v. Kluser*, 360 Or. 698, 702 (2016). Freedom from physical harm is one such protected interest. *Id*. at 702.

Described above, there is no evidence is that Dr. Velez violated any standard of care in prescribing plaintiff's medications. Plaintiff has not produced any evidence to the contrary. Defendant's evidence is that he did not prescribe medications to plaintiff that were intended for some other person; that he was not at any point negligent; that he did not cause plaintiff any foreseeable, serious emotional distress; and, that plaintiff has not been harmed or incurred any damages caused by defendant. Accordingly, summary judgment is granted to defendant.

## CONCLUSION

For the reasons explained, defendant's motion for summary judgment, ECF No. 40, is GRANTED. Plaintiff's RFA motion, ECF No. 42, is DENIED. Defendant Dr. Velez is DISMISSED from this case.


IT IS SO ORDERED.

Dated this  12th  day of   March    2024.



_____ /s/Ann Aiken  
Ann Aiken  
United States District Judge